# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **Harleysville Lake States Insurance Co.,** | ) | |
| | ) | **No. 13 C 6391** |
| **Plaintiff/Counterdefendant,** | ) | |
| | ) | |
| **v.** | ) | **District Judge Samuel Der-Yeghiayan** |
| | ) | |
| **Lancor Equities, Ltd., et al.,** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **Defendants/Counterplaintiffs.** | ) | |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Before the court are Defendants'/Counterplaintiffs' Lancor Equities, Ltd. and Western Properties LP's Motion to Compel (Defs.' Mot. [dkt 95]) and Plaintiff's/Counterdefendant's Motion to Strike the Affidavit of Charles M. Miller (Pl.'s Mot. [dkt 102]). For the reasons set forth below, the motion to compel is granted in part and denied in part, and the motion to strike is denied.

## BACKGROUND

Plaintiff/Counterdefendant Harleysville Lake States Insurance Company ("Harleysville") brought this action pursuant to 28 U.S.C. § 2201, seeking a declaration that the commercial property insurance policy it issued to Lancor Equities, Ltd. and Western Properties, LP (collectively, "Lancor") does not cover loss and damage resulting from a fire on December 29, 2012. (Pl.'s Compl. ¶ 1.) [Dkt 1.] Harleysville claims that the building's sprinkler system had been rendered

inoperative months before the fire and never repaired. (*Id*. ¶ 8.) Harleysville denied Lancor's claim based on an "Increased Hazard" exclusion in the policy: "'We' do not pay for loss occurring while the hazard has been materially increased by any means within 'your' knowledge or 'your' control." (*Id.* ¶ 16 (quoting policy).)

After denying Lancor's motion to dismiss (Mem. Opinion and Order, Feb. 18, 2014 [dkt 64]), the District Judge ordered fact discovery to be completed by October 6, 2014 (Order, May 6, 2014 [dkt 78]). Lancor then filed its answer and counterclaims, including a counterclaim seeking taxable costs and attorneys' fees and a $60,000 penalty pursuant to Illinois Insurance Code § 155, which provides in part:

> In any action by or against a company wherein . . . it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus [a penalty.]

215 Ill. Comp. Stat. § 5/155(1). (Defs.' Answer and Ctrclm.) [Dkt 82.] Harleysville moved to bifurcate or stay proceedings on Lancor's counterclaim because, it argued, Lancor is ineligible for § 155 relief until it has been established that Lancor is entitled to coverage under the policy. (Pl.'s Mem. in Support of Mot. to Bifurcate at 2-3.) [Dkt 92.] The District Judge denied Harleysville's motion to bifurcate or stay proceedings on the § 155 claim. (Order Denying Mot. to Bifurcate.) [Dkt 94.] The parties then jointly sought to extend discovery by 30 days. (Joint Mot. Enlargement of Time.) [Dkt 99.] The District Judge granted the motion and ordered all fact discovery to be completed by November 7, 2014. (Order, Sept. 11, 2014.) [Dkt 101.]

Lancor served 18 document requests, and Harleysville objected to many of them. (Defs.' Mot., Corrected Ex. A.) [Dkt 120.] Lancor then filed the present motion seeking an order compelling Harleysville to produce additional documents. As described below, the parties have resolved a

number of the initial disputes but some disputes remain.

## SCOPE OF DISCOVERY

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). Discovery, though broad, is not unlimited. A court must, on a motion or on its own, limit the frequency or extent of discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Looking at the claims in this case, Harleysville's complaint is a straightforward insurance coverage declaratory judgment action. Lancor's counterclaim under § 155 is a request for a statutory remedy that is contingent on the result of the declaratory action. If Harleysville is correct that there is no coverage for Lancor's claim, Lancor's § 155 claim will necessarily fail. Because Lancor argues that its discovery requests are necessary for its § 155 claim (*see, e.g.,* Defs.' Reply at 5 [dkt 109]), it is important to review the nature of that claim.

Section 155 is "a limited statutory exception" to the rule that attorneys' fees and punitive damages are not generally available in breach of contract actions. *Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897, 901 (Ill. 1996). It was created by the Illinois General Assembly to deal

with the situation where "the holder of a small policy may practically see his whole claim wiped out by expenses if the [insurance] company compels him to resort to court action, although the refusal to pay the claim is based upon the flimsiest sort of pretext." H. Havinghurst, *Some Aspects of the Illinois Insurance Code*, 32 U. Ill. L. Rev. 391, 405 (1937), quoted in *Cramer,* 675 N.E.2d at 901. It is not a "prevailing party" provision. To recover under § 155, Lancor must not only prevail on the coverage issue, it must show that Harleysville's actions or its denial of coverage were "vexatious or unreasonable."

> An insurer's actions are not vexatious and unreasonable if "(1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law."

*TKK USA, Inc. v. Safety Nat'l Casualty Corp*., 727 F.3d 782, 793 (7th Cir. 2013) (quoting *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000).)

A § 155 claim is not the equivalent of a separate claim in contract or tort for an insurer's bad faith refusal to pay insurance benefits, which Illinois does not recognize except in the context of an insurer's failure to act in good faith in response to settlement demands. *Cramer,* 675 N.E.2d at 903 -04. Where the insurer has denied coverage, the insured is limited to a breach of contract action with the additional remedy created by the legislature in § 155. *Id.* at 904. "The fact that a policyholder cannot recover as much as he could in tort arises from the fact that contract law imposes limitations on recovery." *Id.* To the extent that Lancor's arguments rely on cases from other states that allow a separate bad faith claim or upon Illinois cases that predate the Illinois Supreme Court's decision

in *Cramer*, those cases do not reflect current Illinois law.[1]

Whether to award a remedy under § 155 is a factual determination decided within the court's discretion. *West Bend Mut. Ins. v. Norton*, 940 N.E.2d 1176, 1179 (Ill. App. 2010); *Draper v. Stamps*, No. 1-13-1408, 2014 WL 4101202 (Ill. App. Aug. 19, 2014) (collecting cases). Both sides in this case agreed at a hearing on Lancor's motion that the § 155 claim will be decided by the court, not by a jury. In deciding whether to award § 155 relief, the court considers "the totality of the circumstances, including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his or her property." *American States Ins. Co., v. CFM Constr. Co.,* 923 N.E.2d 299, 308 (Ill. App. 2010). As that case illustrates, the "totality of the circumstances" refers to the circumstances of the dispute between the insured and the insurer. *Id.* at 308-09. Because a § 155 remedy is not awarded where there is a *bona fide* dispute concerning coverage, "Illinois courts routinely determine whether an insurer had a *bona fide* coverage dispute (such that its conduct was not unreasonable and vexatious) without holding an evidentiary hearing

---

[1] For example, Lancor's Reply (at 2) cites *Emerson v. American Bankers Ins. of Fla.*, 585 N.E.2d 1315, 1320 (Ill. App. 1992), which held that an insurer's bad faith refusal to provide coverage can give rise to compensatory damages, a theory firmly put to rest four years later in *Cramer:*

> The policyholder does not need a new cause of action to protect him from insurer misconduct where an insurer refuses to pay. The policyholder has an explicit contractual remedy. He can sue for the proceeds due under the policy. . . . The remedy provided by section 155 allows an extracontractual award and specifically defines the limits of this award.

*Cramer*, 675 N.E.2d at 904. *See also APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (observing that the Illinois Supreme Court has held that breach of the covenant of good faith and fair dealing is not an independent cause of action under Illinois law except in the narrow context of an insurer's obligation to settle with a third party who has sued the insured).

where, as here, the underlying facts are undisputed." *Draper,* 2014 WL 4101202 at * 5 (collecting

cases).

When considering what discovery is appropriate on the § 155 claim, the court is required by Fed.

R. Civ. P. 26(b)(2)(C) to recognize that the § 155 claim is the tail on the dog, not the dog itself. The

purpose of that claim is to allow Lancor, if successful, to recoup what it spent to prevail on the

contract claim, plus the statutorily prescribed penalty, but not if Harleysville's denial was a *bona fide*

coverage dispute. It would make little sense to have the costs and attorneys' fees spent in litigating

the § 155 claim approach the fees incurred in litigating the coverage claim.

The Seventh Circuit recently reminded trial courts not to allow parties to "overlitigate" claims,

particularly in cases where fee-shifting is a possibility.

> Trial judges have substantial case-management authority to control the course of litigation
> in their courts. In cases lacking private incentives to limit the scope of litigation, active
> judicial oversight can help prevent straightfoward cases like this one from spiraling out of
> control. . . . Reasonable limits on discovery and trial preparation can effectively channel the
> effort of counsel *before* excessive time and resources are expended.

*Montanez v. Simon*, 755 F.3d 547, 552 (7th Cir. 2014) (emphasis in original).

Here, the mandate to set reasonable limits on discovery is reinforced by the fact the District Judge

maintained the same fact discovery cut-off after denying the motion to defer the § 155 claim, with just

a short extension requested by the parties. This suggests that the District Judge is not anticipating

extensive discovery on the § 155 claim.

Neither Lancor's document requests nor the parties' briefs expressly distinguish between requests

that relate to the complaint and those which relate to the § 155 claim, although as noted above, Lancor

argues that its requests are relevant to its § 155 claim. Because the action was not bifurcated,

discovery must proceed on both claims, and the court must order discovery where appropriate even

if the discovery could only lead to admissible evidence on one of the claims.

**CHARLES MILLER AFFIDAVIT**

As an exhibit to its motion, Lancor included a declaration by Charles Miller who states that

Lancor retained him to provide an expert opinion on whether Harleysville "complied with the

insurance industry practices and standards for claims handling in its handling of Lancor's insurance

claim . . . ." (Defs.' Mot., Ex. C, Decl. Charles Miller ¶ 1.) Mr. Miller states:

> The documents requested by Lancor are highly relevant to any evaluation of Harleysville's
> handling of Lancor's claim. . . . Overall, the documents sought are likely to reveal whether
> or not Harleysville complied with insurance industry claims handling standards and practices
> and as such, they are essential to any complete evaluation of Harleysville's handling of
> Lancor's claim.

(Id. ¶ 9, 10.)

Harleysville has filed a motion to strike Mr. Miller's declaration and a memorandum in support

of that motion. (Pl.'s Mot. [dkt 102]; Pl.'s Mem. [dkt 103].) Harleysville argues that the Mr. Miller's

comment that the documents are "relevant" is an improper legal conclusion. (Pl.'s Mem. at 2.)

Harleysville correctly observes that determinations of relevance are solely the domain of the court.

(*Id*. at 3.) "The only legal expert in a federal courtroom is the judge." *U.S. v. Lupton*, 620 F.3d 790,

800 (7th Cir. 2010) (quoting *U.S. v. Caputo,* 517 F.3d 935, 942 (7th Cir. 2008).) Lancor responds

that Mr. Miller intended to express the relevance of the requested documents to his evaluation and

to guide the court as to why Mr. Miller believes he needs the documents. (Defs.' Resp. at 3.)

[Dkt108.] Taking the declaration in that light, the motion to strike is denied. The proper scope of

discovery, however, is to be determined by the court, regardless of what Mr. Miller believes he needs

for his opinion.[2]

## RESOLVED AND UNRESOLVED DISPUTES

The parties have resolved some of the disputes originally presented in Lancor's motion. Lancor's Request Number 1 sought claim handling policies, practices, and procedures. (Defs.' Mot. at 5.) Lancor further clarified this request in an email to Harleysville on September 1, 2014, limiting the request to Harleysville's Code of Ethics for 2012. (Defs.' Reply, Ex. A.) [Dkt 110.] In a hearing on October 2, 2014, Harleysville agreed to produce the Code of Ethics for 2012. (Continued Hearing on Defs.' Mot. 10/02/2014.) Also not in dispute is Request Number 3, which sought complaints against Harleysville from 2009 to present. (Defs.' Mot. at 7.) Lancor subsequently limited that request to complaints and answers filed between 2009 and 2012 in Illinois state and federal court in cases concerning the commercial output policy, the "Mortgagee Provisions," and the "Increased Hazard" exclusions within that policy. (Defs.' Reply, Ex. A.) Harleysville agreed to produce the requested documents, while also expressing concern about additional discovery or 30(b)(6) depositions arising from it. (Continued Hearing on Defs.' Mot. 10/02/2014.) Regarding Request Number 10, which seeks underwriting manuals and procedures, and Request Number 11, which seeks loss control manuals and procedures, Harleysville did not indicate any dispute in its briefing or in the motion hearing. (Pl.'s Resp.) [Dkt 105.] (Continued Hearing on Defs.' Mot. 10/02/2014.) Disputes remain concerning Requests 2, 4, 5, 6, 7, 8, 12, 15, and 17.

---

[2] This court expresses no view about whether any opinion that Mr. Miller may have will be admitted by the District Judge for any purpose. Notably, Mr. Miller's declaration does not cite any Illinois case law.

<u>Request Numbers 2 and 12</u>

Request Number 2 seeks "[a]ll documents used by or referred to by Harleysville in interpreting the provisions and exclusions contained in the Policy including but not limited to, manuals, technical bulletins, publications, guidelines, memos, standards, criteria, interpretive materials, and practices and procedures." (Defs.' Mot., Corrected Ex. A at 5.) Request number 12 seeks "[a]ll documents concerning drafting, drafting history, origin, definition, meaning, construction, interpretation, application and/or modification of the 'Increased Hazard' exclusion raised in the Complaint." (*Id.* at 9.) Harleysville argues the information is irrelevant and not calculated to lead to the discovery of admissible evidence because a court does not consider extrinsic evidence like drafting history in construing unambiguous policy language. (Pl.'s Resp. at 3 (citing *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 495-96 (Ill. 2001).) Harleysville states that its Increased Hazard provision is unambiguous (Pl.'s Resp. at 4), but the District Judge has not determined whether that is so.

Although the parties lump them together, the requests are analytically different. Request Number 2 is plainly overly broad for any purpose in this litigation. Many "provisions and exclusions" in the policy at issue are not at issue in this case, and to compel Harleysville to produce any documents consulted by Harleysville at any time under any circumstances with respect to any of the policy terms that are at issue in this case is well beyond what is appropriate under Fed. R. Civ. P. 26(b)(2)(C).

In its motion, Lancor says that it is looking "notably" for documents relating to the Mortgagee Provision and the Increased Hazard exclusion. (Defs.' Mot. at 6.) What is relevant and within the proper scope of discovery with respect to both the claim and the counterclaim are documents, if any, to which Harleysville referred or which Harleysville used to interpret the "Mortgagee Provisions" and the "Increased Hazard" exclusion in determining that Lancor's loss was not covered. The motion is

granted to require production of any such documents.

With respect to Request Number 12 concerning the drafting history of the Increased Hazard exclusion, courts have considered the drafting history of an ambiguous provision. *See, e.g., Alberto-Culver Co. v. Aon Corp*, 812 N.E.2d 369, 380-81 (Ill. App. 2004) (considering evidence that the insurer had modified a provision in response to an earlier accident). At the hearing on Lancor's motion, Harleysville's counsel represented that it does not possess documents relating to the drafting history of the Increased Hazards exclusion because it did not draft the exclusion. (Continued Hearing on Defs.' Mot. 10/02/2014.)[3] The motion is granted as follows: Harleysville must produce all documents reflecting any modification of the Increased Hazards exclusion between 2009 and 2012, and all documents reflecting any involvement by anyone on behalf of Harleysville in the drafting of the Increased Hazards exclusion or any modification of it. If Harleysville has no such documents, it must amend its document response to so state.

Request Numbers 4, 5, and 8

Request Number 4 sought Harleysville's personnel files for all personnel involved in Lancor's claim, including background, qualifications, training, performance evaluations, and compensation information from the files. (Defs.' Mot. at 7-8.) Request Number 5 sought performance goals, plans, and objectives for such personnel. (*Id.*) Request Number 8 sought documents related to the basis in which Harleysville employees are compensated, including incentive or bonus programs. (*Id.* at 9-10.)

---

[3] It has been argued in other cases that any drafting history regarding a policy term that was derived or taken in whole from another insurer group would not reflect what the particular adopting insurer intended. *See* 17A Steven Plitt, Daniel Moldonado, Joshua D. Rogers, and Jordan R. Plitt, *Couch On Insurance* § 251:24 (3d ed.).

Lancor subsequently limited Requests 4 and 5 to the performance evaluations, performance goals, and incentive bonus compensation between 2009 and 2012 for only the personnel involved in Lancor's claims. (Defs.' Reply, Ex. A.) Lancor limited Request Number 8 to the documents describing the incentive bonus plan testified to by Gary O'Rourke and how bonuses are earned under that bonus plan. (*Id*.) Mr. O'Rourke, who apparently is or was a Harleysville employee, testified that there was a bonus program at Harleysville based on "how well the company is doing" and "meet[ing] certain financial goals." (Defs.' Reply, Ex. B, Dep. Gary O'Rourke at 60, 63.)[4]

Relying on cases from other jurisdictions, Lancor argues that these documents "are discoverable in a bad faith action, as they may provide evidence of an improper corporate culture or inappropriate reasons for the insurance company's actions regarding the claim." (Defs.' Mot. at 8.) Harleysville argues that no Illinois case supports those requests, and also asserts that Lancor's analogy to the common law bad faith tort cases is inappropriate. (Pl.'s Resp. at 6-7.)

As discussed above, Illinois does not recognize a "bad faith claim" in either tort or contract. Any remedy Lancor may receive, if it demonstrates that Harleysville wrongly denied its claim and that the denial was vexatious or unreasonable, is limited to § 155. *See Cramer*, 675 N.E.2d at 904. The absence of any Illinois cases allowing such discovery on a § 155 claim is likely the result of the difference between that remedy and a bad faith tort claim. Discovery in jurisdictions that recognize a bad faith tort claim could reasonably be broader because the required proof is different – including an element of subjective intent – and the potential recovery is different.[5] Accordingly, Lancor's

---

[4] The portions of Mr. O'Rourke's deposition attached to Lancor's Reply do not disclose Mr. O'Rourke's position at Harleysville.

[5] That is illustrated by *Anspach v. United of Omaha Life Ins. Co.*, No. 10-5080-JLV, 2011 WL 3862267 (D. S. D. Aug. 31, 2011), one of the cases Lancor cites. In considering the

Requests 4, 5 and 8 are not reasonably calculated to lead to admissible evidence.

Furthermore, even if there were some arguable relevance, Fed. R. Civ. P. 26(b)(2)(C)(iii) guides the court to the conclusion that the discovery Lancor seeks in Requests 4, 5 and 8 is not proportionate to the § 155 claim. Delving into the performance evaluations of the persons involved in Lancor's claim and exploring the nature of Harleysville's employee bonus plan would set the parties off on a path of extended discovery that would multiply attorneys' fees and costs disproportionately to the limited remedy § 155 allows. Such an exercise would go far afield from what is considered in deciding if Harleysville's denial was "vexatious or unreasonable" under the applicable standard. *See TKK USA*, 727 F.3d at 793 (*see supra* section on scope of discovery). It would likely require weeks if not months of additional discovery time, precisely the type of discovery "spiraling out of control" that the Seventh Circuit's decision in *Montanez* directs trial courts to prevent. Accordingly, Lancor's motion is denied as to Requests 4, 5, and 8.

### Request Numbers 6 and 7

Lancor's Request Number 6 sought all documents related to any Harleysville quality assurance program since 2009. (Defs.' Mot. at 9.) Lancor's Request Number 7 sought "[a]ll documents related to Harleysville's strategies, programs, plans, directives, goals, incentives, etc., developed since 2009 relating to tracking and measuring the amount of overpayment or underpayment on a claim . . . ."

---

scope of discovery on a bad faith tort action under South Dakota law, the court observed that in a bad faith claim, the insured must show not only the an absence of a reasonable basis for denial of policy benefits, but also "knowledge or reckless disregard of the lack of a reasonable basis for denial." Anspach, 2011 WL 3862267 at *6. The insurer will be liable for bad faith only where it has "intentionally" denied a claim without a reasonable basis. *Id.* (quotations and citations omitted). Under South Dakota law, punitive damages are available on a bad faith claim. *Id.*

(Defs.' Mot., Corrected Ex. A at 6-7.)  Lancor subsequently limited those extremely broad requests

somewhat and is now seeking "documents setting forth the manner in which closed files are reviewed,

the results of the reviews for the period 2009-2012 for Illinois claims, and the reviews of closed files

handled by the personnel involved in the claims."  (Defs.' Reply, Ex. A).

Harleysville again observes that no Illinois case law supports Lancor's requests and further states

that the claim at issue in this case remains open. (Pl.'s Resp. at 6-7.)  In reply, Lancor simply points

to Mr. Miller's declaration.  (Defs.' Reply at 7.)

Even considering Mr. Miller's declaration, it is not clear how documents about Harleysville's

review of closed cases will lead to admissible evidence that Harleysville's denial of Lancor's claim

was unreasonable or vexatious.  Lancor's Request 6 and 7, even as modified, would require

Harleysville to search for and produce four years of  material covering cases unrelated to Lancor's

claim.  As with Requests 4, 5 and 8, even if there were, *arguendo*, some marginal relevance, that is

outweighed by the factors set forth in Fed. R. Civ. P. 26(b)(2)(C)(iii).  The motion is denied as to

Requests 6 and 7.


## Request Number 15

Lancor's Request 15 seeks documents related to Harleysville's loss reserve history for the fire

loss and ensuing claim.  (Defs.' Mot., Corrected Ex. A at 10.)  Harleysville argues that loss reserve

information is not relevant to the interpretation of the policy.  (Pl.'s Resp. at 11.)  Apparently, Lancor

does not contest that point; rather, Lancor argues that loss reserve information is discoverable on a

bad faith claim.  (Defs.' Mot. at 13.)

A 'loss reserve' is, in simple terms, the insurer's own estimate of the amount which the

insurer could be required to pay on a given claim. This not only helps insurers 'budget' their finances, but is generally required by statute or regulation as to the aggregate of the claims against the insurer.

17A Steven Plitt, Daniel Moldonado, Joshua D. Rogers, and Jordan R. Plitt, *Couch On Insurance* § 251:29 (3d ed.).

Lancor cites a number of cases from jurisdictions other than Illinois. (Defs.' Mot. at 13.) As discussed above, a § 155 claim under Illinois law is not equivalent to the type of bad faith claim that exists in other states, and what is reasonable discovery on a bad faith tort or contract claim is not necessarily reasonable discovery here.

Lancor also cites *Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, No. 03-1224, 2005 WL 3690565 at *9 (C.D. Ill. Jan. 31, 2005), an insurance coverage declaratory action in which the plaintiff-insured sought information about how the defendants calculated premium and loss reserves, arguing that if the defendant set a large reserve and then denied the claim, it would demonstrate bad faith.[6] The magistrate judge found loss reserve information would be discoverable on a bad faith claim but ultimately deferred ruling pending the district judge's decision on a motion to dismiss the bad faith claim. *Id.* It is not clear whether the loss reserve information was, in fact, produced in that case.

Harleysville responds that a § 155 claim does not place the loss reserve information at issue in a first-party case, citing *Spearman Industries Inc. v. St. Paul Fire and Marine Ins. Co.*, 128 F. Supp. 2d 1148 (N.D. Ill. 2001). In that case, a commercial property owner sought coverage for damage to the roof of a building and asserted a claim for bad faith delay. *Id.* at 1153. The parties agreed that

---

[6] Some decisions refer to a § 155 claim as a "bad faith claim" although it is clear after *Cramer* that the remedy for a vexatious or unreasonable denial of coverage is limited to § 155.

information about the insurer's reserves on the claim was irrelevant to the issue of coverage, and the court ruled that evidence about reserves was also inadmissible on the bad faith claim in a first party insurance claim (such as the *Spearman* case or this case). "[I]n first-party insurance, the policy either provides coverage or does not. Thus, the potential for liability – and therefore reserve information– is irrelevant to a bad faith claim." *Id.*

In reply, Lancor cites *Caliber One Indem. Co. v. Millard Chicago Window Cleaning*, No. 04 C 2424, 2006 WL 573895 at *2 (N.D. Ill. Mar. 6, 2006), in which the court held that certain reserve calculations were discoverable. *Caliber One,* however, was a significantly different case from the present one. The plaintiff-insurer there sought rescission of a liability insurance contract with defendant, and the defendant-insured's counterclaim alleged that the plaintiff had provided inadequate defense in an underlying personal injury lawsuit. The defendant sought reserve information related to the underlying personal injury lawsuit, which would be a third-party lawsuit. *Id.* The *Caliber One* decision quotes the *Spearman* decision that "[i]n considering a bad faith claim in third-party [liability] insurance, the fact that the defendant established a reserve may be probative on the issue of whether there is a *potential* for liability, and thus reserve information may be relevant to bad faith." *Id.* (quoting *Spearman*, 128 F. Supp. 2d at 1154) (emphasis in original). *Caliber One* does not support Lancor's argument that any reserve calculation related to Lancor's claim is discoverable or likely to lead to admissible evidence in this case.

Lancor's argument for information about reserves is limited to citing those cases and referring to Mr. Miller's declaration. (Defs.' Mot. at 13.) Mr. Miller, in turn, simply says that the reserves will "reflect Harleysville's evaluation of Lancor's claim." (Defs.' Mot., Ex. C, Decl. Charles Miller ¶ 26.) As discussed above, that argument has not found acceptance in Illinois cases dealing with first-party

claims such as this.  Lancor's motion to compel is denied as to Request No. 15.


Request Number 17

Lancor Request Number 17 seeks "[a]ll documents relating to Harleysville's reinsurance coverage – both facultative and treaty – for first-party property claims from the year 2009 up to and including the present" including not only copies of the policies or contracts but also correspondence related to losses and claims, and other documents.  (Defs.' Mot., Corrected Ex. A at 11-12.)  Its argument for requiring this extensive document production is sparse.  It states in a conclusory way that "[r]einsurance agreements themselves are discoverable" and "[c]ommunications with reinsurers . . . about the Policy . . . may lead to the discovery of relevant evidence."  (Defs.' Mot. at 13-14.)

Harleysville responds that reinsurance information is at best intrinsic evidence that may not be introduced to vary the unambiguous policy terms.  (Pl.'s Resp. at 9.)  It also points out that the common interest doctrine may protect communications between Harleysville and its reinsurers.  (*Id.* at 10, citing *Waste Mgmt, Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322 (Ill. 1991).)  In reply Lancor states, "At a minimum, any reinsurance agreement should be produced."  (Defs.' Reply at 8.)

"Parties in direct-side insurance coverage litigation frequently dispute the discoverability of the cedent's reinsurance information.  Courts disagree on whether reinsurance information is discoverable."  7 *New Appleman on Insurance Law Library Edition* §77.01[2][a] (footnote and citations omitted).

Fed. R. Civ. P. 26(a)(1)(A)(iv) requires the disclosure of "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment."  Under Illinois law:

16

[a] reinsurance agreement is different from a policy or contract of direct insurance in both form and substance. . . . [A] reinsurance agreement is distinct from and unconnected with the original insurance policy; the original policyholder – the entity whose loss is insured – is not a party to the reinsurance agreement.

*In re Liquidations of Reserve Ins. Co.*, 524 N.E.2d 538 540-41 (Ill. 1988).

Although some federal courts have not required the production of reinsurance agreements, *see, e.g., Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 139 F.R.D. 609 (E.D. Pa. 1991), a number of courts in this district have required disclosure of reinsurance agreements. *See, e.g., Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co.,* 159 F.R.D. 502 (N.D. Ill. 1995). Accordingly, the motion is granted to require the disclosure of any reinsurance agreement that may indemnify Harleysville for Lancor's claim. Recognizing that reinsurance may be sensitive business information, Harleysville may designate the agreement or agreements as "Confidential Information" under the Confidentiality Order previously entered in this case. (Order, Jan. 7, 2014.) [Dkt 52.]

The scope of Lancor's Request 17, however, encompasses much more than the production of reinsurance agreements related to the policy at issue here. That request seeks all documents related to any reinsurance coverage for any first-party property claim, and correspondence related to any loss or claim. (Defs.' Mot., Corrected Ex. A at 11-12.) That is plainly too broad. Lancor's motion and reply do nothing to justify such a broad fishing expedition. As Harleysville observes, communications with its reinsurers may be protected by work product or the common interest extension of attorney-client privilege. *See ARTRA 524(g) Asbestos Trust v. Transport Ins. Co.*, No. 09 C 548, 2011 WL 4501375 (N.D. Ill. Sept. 28, 2011). The court will not compel Harleysville to go beyond disclosing the reinsurance agreement or agreements and into a scope of production likely to generate disputes about privilege and work product protection in response to a request that goes

well beyond the claims and defenses in this case. Accordingly, the motion is denied as to the remainder of Lancor's Request No. 17.

## CONCLUSION

For the reasons set out here, Lancor Equities, Ltd. and Western Properties LP's Motion to Compel [dkt 95] is granted in part and denied in part as set out herein. Harleysville Lake States Insurance Company must produce the documents required by this order no later than November 10, 2014. Plaintiff's Motion to Strike the Affidavit of Charles M. Miller [dkt 102] is denied.


IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge


October 31, 2014